**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, the COMMONWEALTH OF VIRGINIA, and the STATE OF NEW JERSEY *ex rel.* CHRISTINE HODGE, <br><br>　　　　Plaintiffs, <br><br> v. <br><br><br> URGENT CARE HOLDINGS, INC. d/b/a MEDEXPRESS URGENT CARE, <br><br>　　　　Defendant. | Civil Action No. 21-7595 (SDW)(LDW) <br><br><br><br> **OPINION** <br><br><br> November 29, 2022 |

**WIGENTON**, District Judge.

Before this Court is Defendant Urgent Care Holdings, Inc. d/b/a MedExpress Urgent Care's ("Defendant" or "MedExpress") Motion to Dismiss (D.E. 21) Plaintiff Relator Christine Hodge's ("Plaintiff" or "Relator") First Amended Complaint (D.E. 17 ("FAC")) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  Jurisdiction is proper pursuant to 28 U.S.C. § 1332.  Venue is proper pursuant to 28 U.S.C. §§ 1441(a) and 1445(a).  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated below, Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND AND PROCEDURAL HISTORY**

This matter involves a *qui tam* claim under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.,* as well as claims under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* ("VFATA"), and New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-

1 *et seq.* ("NJFCA"), arising out of allegedly fraudulent claims presented by MedExpress to the Centers for Medicare & Medicaid Services ("CMS"), Virginia Department of Medical Assistance Services ("VA DMAS"), and New Jersey Division of Medical Assistance and Health Services ("NJ DMAHS") for payment of funds.  (*See generally* FAC.)

MedExpress owns and operates over 190 urgent care clinics in a dozen states, including New Jersey, Virginia, and West Virginia.  (FAC ¶ 22.)  From March 2020 to September 2021, Relator worked as a physician assistant at Defendant's urgent care clinics in the following Virginia cities: Roanoke, Salem, Christiansburg, Harrisonburg, Staunton, Danville, Martinsville, and Lynchburg.[1]  (FAC ¶ 20.)  During the COVID-19 pandemic, Relator alleges that MedExpress fraudulently coded patient visits for COVID-19 antigen testing at higher rates of service than were rendered by providers and billed medically unnecessary office visits to patients who had no symptoms, no exposure to COVID-19, and a negative COVID-19 antigen test to seek reimbursement from Medicaid and Medicare.  (FAC ¶¶ 68–102.)

The FAC sets forth that CMS adopted the American Medical Association's ("AMA") January 1, 2021, newly revised guidelines for selecting office, outpatient, and Evaluation and Management ("E/M") visit codes.  (FAC ¶ 50.)  Pursuant to AMA guidelines, providers are allowed to select an E/M level based on either time spent by the provider, or the complexity of medical decision making ("MDM").  (FAC ¶ 51.)  For instance, "if time is used to determine the E/M level, CPT codes 99203/99213 are appropriate if the provider spends 30 to 44 minutes with a new patient, or 20 to 29 minutes with an established patient."  (FAC ¶ 53.)  However, "if MDM is used to determine the E/M level, CPT codes 99203/99213 are appropriate if the MDM level is

---

[1] The FAC does not allege that Relator worked in any of Defendant's urgent care clinics in New Jersey or West Virginia.  (FAC ¶ 20.)

low." (FAC ¶ 54.)  The MDM level is comprised of three elements.  (FAC ¶ 55.)  To meet a particular MDM level, two of the three elements must be met or exceeded.  (FAC ¶ 56.)

The FAC sets forth that an MDM level of "low" corresponds to a Level 3 (CPT code 99203 or 99213) and requires the following elements:

**(1)  Element 1: Number and Complexity of Problems Addressed**
- 2 or more self-limited or minor problems; or
- 1 stable chronic illness; or
- 1 acute, uncomplicated illness or injury

**(2)  Element 2: Amount and/or Complexity of Data to be Reviewed (Must meet at least one category below)**
- Category 1: Tests and documents (any combination of 2 from the following)
    1. Review of prior external note(s) from each unique source
    2. Review of the result(s) of each unique test
    3. Ordering of each unique test

- Category 2: Assessment requiring an independent historian(s)

**(3)  Element 3: Risk of Complications and/or Morbidity or Mortality of Patient Management**
- Low risk of morbidity from additional diagnostic testing or treatment (Examples: over-the-counter drugs, minor surgery with no identified risk factors, physical therapy, occupational therapy, and IV fluids without additives)

(FAC ¶ 57.)

In contrast,  an MDM level of "straightforward" corresponds to a Level 2 (CPT code 99202 or 99212) and requires the following elements:

**(1)  Element 1: Number and Complexity of Problems Addressed**
- 1 self-limited or minor problem

**(2)  Element 2: Amount and/or Complexity of Data to be Reviewed**
- Minimal or none

**(3)  Element 3: Risk of Complications and/or Morbidity or Mortality of Patient Management**
- Minimal risk of morbidity from additional diagnostic testing or treatment (Examples: rest, gargles, elastic bandages, superficial dressings)

(FAC ¶ 59.)

Relator alleges that MedExpress "coded and billed COVID-19 antigen tests provided to patients who had zero symptoms, no known exposure to the virus, and tested negative for the virus, as [Level 3 E/M] office visits, even though the patient-provider encounters lasted for just a few minutes and the patients were sent home without follow-up care." (FAC ¶¶ 3, 68–102.) Purportedly, "these visits should have been billed as Level 2 or not billed at all." (*Id.*) The FAC sets forth that Relator received instructions from MedExpress to use diagnosis code Z20.828 (a code appropriate for patients who report exposure to COVID-19), for all COVID-19 antigen test visits, even when a patient reported no suspected exposure to COVID-19.[2] (FAC ¶¶ 72, 73, 98–102.) Relator attended monthly calls wherein MedExpress directed providers to always use the Z20.828 code for any visits related to COVID-19, including COVID-19 test visits. (FAC ¶¶ 98–101.) At every clinic Relator worked, she found written instructions directing providers to use the Z20.828 code for COVID-19 test visits. (FAC ¶ 102.)

While working at MedExpress' clinics in Virginia, Relator observed MedExpress using an electronic medical records system ("EMR") for clinical documentation and asserts that the EMR was also used in MedExpress' New Jersey and West Virginia locations. (FAC ¶¶ 68–70.) Relator asserts that the vast majority of patient visits documented with diagnosis code Z20.828 were automatically coded as E/M Level 3 (CPT codes 99203/99213) or higher by the EMR.[3] (FAC ¶¶ 72–74.) For example, when Relator selected diagnosis code Z20.828 for all COVID-19 antigen testing patients, the EMR routinely filled in CPT codes 99203 or 99213, even for patients with no

---

[2] Relator contends that the selection of the Z20.828 diagnosis code for asymptomatic patients was inappropriate because the appropriate codes for patients without exposure or contact with someone actively infected with COVID-19 is Z11.52 or Z11.59. (FAC ¶ 73.)

[3] The FAC sets forth that the "CPT codes 99203 and 99213 represent a Level 3 E/M Visit for new and established patients, respectively." (FAC ¶ 52.)

symptoms, no exposure, and a negative COVID-19 antigen test result.  (FAC ¶ 72.)  For these patients, Relator contends that the service rendered by Defendant's providers did not meet the requirements for a Level 3 E/M visit because the time spent per encounter did not exceed the minimum 20 or 30-minute thresholds and the level of medical decision making did not rise to low complexity.  (FAC ¶ 80.)  Further, in December 2020, Relator alleges that a patient came to the urgent care clinic in Roanoke, Virginia for a COVID-19 antigen test.  (FAC ¶ 76.)  Shortly thereafter, the patient received a billing statement that reflected a Z20.828 diagnosis code and the patient's insurance was billed for a Level 3 E/M (CPT code 99203) visit.  (FAC ¶ 76.)

Relator "reviewed patient charts in the EMR and [] confirmed that encounters for patients with no symptoms, no exposure, and a negative COVID-19 test result, were coded and billed to Medicare and Medicaid as Level 3 E/M visits." (FAC ¶ 105.)  For example, in March 2021, at the Salem, Virginia clinic, Relator reviewed documentation demonstrating that visits with Medicare beneficiaries had been fraudulently upcoded[4] to Level 3 E/M, even though the beneficiaries had no symptoms, no exposure, and a negative COVID-19 antigen test.  (FAC ¶ 105.)  The FAC sets forth that it was MedExpress' practice to bill medically unnecessary office visits to asymptomatic patients that received the COVID-19 antigen test and had insurance through Medicaid or Medicare. (FAC ¶¶ 79, 80, 82–83, 86.)  MedExpress was purportedly aware that the upcoded visits for which they billed insured patients were medically unnecessary because MedExpress did not require such visits for asymptomatic patients whose COVID-19 antigen tests were paid for under the Employer Health Services ("EHS") program.  (FAC ¶¶ 88–97.)  Relator contends that MedExpress presented these fraudulent reimbursement claims containing upcoded and medically unnecessary patient

---

[4] The FAC defines "upcoding" as a claim billed at a higher level of E/M service than rendered.  (FAC ¶ 60.)

visits to CMS, NJ DMAHS, and VA DMAS for the treatment of Medicare and Medicaid beneficiaries.  (FAC ¶ 106.)

On March 30, 2021, Relator filed her original *qui tam* Complaint under seal.  (D.E. 1.)  On November 15, 2021, the United States, the State of New Jersey, and the Commonwealth of Virginia declined to intervene in this action and requested the action be unsealed.  (D.E. 4.)  On March 8, 2022, MedExpress moved to dismiss Relator's Complaint.  (D.E. 15.)  On March 21, 2022, Relator filed a First Amended Complaint.  (D.E. 17.)  On April 4, 2022, MedExpress moved to dismiss Relator's First Amended Complaint.  (D.E. 21, 22.)  All subsequent briefing has been filed.  (D.E. 25, 28.)

## II.  <u>LEGAL STANDARD</u>

A court may dismiss an action under Fed. R. Civ. P. 12(b)(6) if a plaintiff fails to state a claim upon which relief can be granted.  *Id.*  When evaluating a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, a court conducts a three-part analysis.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court "takes note of the elements a plaintiff must plead to state a claim."  *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the

assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 679).  For example, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678, nor is this Court compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).  Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680).  This is a "context-specific task that requires the [ ] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.   <u>DISCUSSION</u>

### A.   **FCA Claims (Counts One & Two)**

The FCA prohibits the submission of false or fraudulent claims for payment to the United States and authorizes *qui tam* actions, by which private individuals may bring a lawsuit on behalf of the government in exchange for the right to retain a portion of any resulting damages award. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk,* 563 U.S. 401, 131 S. Ct. 1885, 179 L.Ed.2d 825 (2011).  Under the FCA any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is civilly liable to the United States.  31 U.S.C. § 3729(a)(1)(A).  The FCA also makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to" a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).  A relator's pleadings must satisfy all three elements of the FCA, as well as satisfy Rule 9(b)'s heightened pleading standard.  The Relator has pleaded a *prima facie* claim under the FCA.

### i.   The FAC Satisfies All Three Elements of the FCA

To make out a *prima facie* case, the relator must plead three elements: "'(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'" *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 175 (3d Cir. 2019) (quoting U.*S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004)).

Accepting the factual assertions made in the FAC as true, this Court is satisfied that Relator has alleged sufficient facts to plead a *prima facie* claim under the FCA.  First, by submitting reimbursement claims to CMS and/or other federal health programs, MedExpress presented claims for payment to the government.  (FAC ¶¶ 106–107.)  Second, Relator alleges that these claims were false.  (*See generally* FAC ¶¶ 50-105.)  The FAC sets forth that it was company-wide policy at MedExpress to use diagnosis code Z20.828, indicating patient exposure to COVID-19, as a "blanket diagnosis for all COVID-19 test visits, even when a patient report[ed] no suspected exposure to COVID-19."  (FAC ¶¶ 72–73, 98–102.)  Relator alleges that when she selected diagnosis code Z20.828 for all COVID-19 antigen testing patients, the EMR routinely filled in CPT codes 99203 or 99213, even for patients with no symptoms, no exposure, and a negative COVID-19 antigen test result.  (FAC ¶ 72.)  Relator reviewed patient charts showing that encounters for patients with no symptoms, no exposure, and a negative COVID-19 test result, were coded and billed to Medicare and Medicaid as Level 3 E/M visits.  (FAC ¶ 105.)  For these asymptomatic patients, Relator contends that the services rendered by MedExpress did not meet the requirements for a Level 3 E/M visit and should have been billed as Level 2 because the patient-provider encounters lasted for just a few minutes, no previous medical records were reviewed,  and the patients were sent home without follow-up care.  (FAC ¶¶ 3, 68–102.)  Third, Relator's

allegations plead scienter.  The FCA requires that the defendants know, deliberately ignore, or recklessly disregard the falsity of their claim.  31 U.S.C. § 3729(b)(1)(A).  But it does not require a specific intent to defraud.  *Id.* § 3729(b)(1)(B).  Relator alleges that MedExpress knew its coding and billing of asymptomatic patients with insurance through Medicaid or Medicare were unnecessary because MedExpress did not require such visits for asymptomatic patients whose COVID-19 antigen tests were paid for by their employers.  (FAC ¶¶ 88–97.)  The FAC sets forth that it was MedExpress' practice to use diagnosis code Z20.828 for all COVID-19 test visits regardless of medical necessity.  (FAC ¶¶ 72–73, 98–102.)  Relator alleges that she received emails from MedExpress directors, attended monthly calls, and saw written instructions directing providers to use the Z20.828 diagnosis code for any visits related to COVID-19.  (FAC ¶¶ 98–103.)  While Defendant raises a number of factual disputes regarding the proper application of the coding and reimbursement rules for office visits, such evaluation is not appropriate at the motion to dismiss stage.  (D.E. 22 at 17–30.)  Relator has alleged plausible allegations regarding MedExpress' practice of coding and billing COVID-19 antigen test patients.  Accordingly, Relator has pled sufficient facts to state a claim under the FCA.

### ii.    The FAC Satisfies Rule 9(b)

The FAC satisfies the heightened pleading requirements of Rule 9(b).  "To do so, allegations must go well beyond Rule 8's threshold of plausibility.  A mere plausible inference of illegality is not enough."  *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019).  Instead, "a relator must establish a strong inference that false claims were submitted and the possibility of a legitimate explanation undermines the strength of the inference of illegality." *United States ex rel. Silver v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018) (quoting *Foglia v. Renal Ventures Mgmt.*, 754 F.3d 153, 158 (3d Cir. 2014) (internal quotations omitted)).  In general, Rule 9(b) requires a relator "to plead fraud with particularity, specifying the time, place and

substance of the defendant's alleged conduct." *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). In the FCA context, however, a relator must provide only "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 157–58. A relator must allege "'the who, what, when, where, and how of the events at issue.'" *United States ex rel. Bookwalter v. UPMC*, 946 F.3d at 176 (quoting *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306–07 (3d Cir. 2016)).

Importantly, "Rule 9(b) does not require the relators to plead anything more, such as the date, time, place, or content of every single allegedly false Medicare claim" because the "falsity here comes not from a particular misrepresentation, but from a set of circumstances that, if true, makes a whole set of claims at least prima facie false." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d at 176. Furthermore, a relator need not show "the exact content of the false claims in question," as "requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Foglia*, 754 F.3d at 156 (quotations and citation omitted).

Here, Relator has pled facts with sufficient particularity to suggest that MedExpress billed Medicaid and Medicare for upcoded and medically unnecessary office visits. (*See generally* FAC.) The FAC pleads facts demonstrating, *inter alia*, that (1) MedExpress instructed Relator to use the Z20.828 diagnosis code for all COVID-19 antigen test visits; (2) MedExpress' EMR automatically coded and billed office visits at Level 3 E/M when the Z20.828 diagnosis code was added to a patient's chart; (3) Relator reviewed documentation at MedExpress' clinics in Virginia confirming

that visits with Medicare beneficiaries had been fraudulently upcoded to Level 3 E/M; and (4) asymptomatic patients with insurance paid for by their employer were not billed for office visits. (FAC ¶¶ 68–87, 98–102, 105.)  The FAC sets forth all the necessary details of "the who, what, when, where, and how" of the FCA claim at issue.  *United States ex rel. Bookwalter v. UPMC*, 946 F.3d at 176.  The FAC pleads:

- o   Who?  MedExpress.  (*See generally* FAC.)

- o   What?  MedExpress submitted or caused to be submitted false Medicare and Medicaid claims.  (FAC ¶ 106.)

- o   When?  Beginning January 1, 2021, when the new E/M coding guidelines went into effect.  (FAC ¶ 50.)

- o   Where?  At over 190 urgent care clinics, which includes MedExpress clinics in Virginia where the Relator worked.  (FAC ¶¶ 22, 68–105.)

- o   How?  For patients with insurance through Medicaid or Medicare, MedExpress billed patients at a higher level of care than the services actually rendered by providers and required office visits for all insured patients regardless of medical necessity.  (FAC ¶¶ 68–87, 98–102, 105.)  MedExpress' EMR automatically selected Level 3 E/M when diagnosis code Z20.828 was added to a patient chart, even when the patient had no symptoms, no exposure to COVID-19, and a negative COVID-19 antigen test result.  (FAC ¶ 72.)

Accordingly, the factual allegations pled in the FAC provide a detailed narrative of how MedExpress purportedly billed upcoded and medically unnecessary office visits.  Rule 9(b)'s heightened pleading requirements is sufficiently satisfied.

## B. VFATA Claims (Counts Three & Four)

Relator alleges violations of the VFATA stating that Defendant's conduct constituted the (1) presenting "of claims for payment to the Commonwealth of Virginia and DMAS for services that were medically unnecessary and not rendered at the level for which reimbursement was claimed" and the (2) making of "false records or statements material to the false or fraudulent claim for payment that Defendant submitted to Virginia and DMAS."  (FAC at ¶¶ 118, 123–24.)

For the same reasons discussed above, Relator's VFATA claims are sufficiently pled. Throughout the FAC, Relator asserts factual allegations concerning MedExpress' billing and coding based upon her "firsthand" experience as a physician assistant at eight of MedExpress' clinics in Virginia.  (FAC ¶¶ 68–106.)  Relator alleges that it was company-wide policy for providers to select diagnosis code Z20.828, indicating COVID-19 exposure, for all COVID-19 testing patients.  (FAC ¶¶ 98, 99.)  Relator received emails from MedExpress directors, attended monthly calls, and saw written instructions at each urgent care clinic directing providers to use code Z20.828 for any visits related to COVID-19.  (FAC ¶¶ 98–103.)  The FAC alleges that MedExpress' EMR automatically selected Level 3 E/M when diagnosis code Z20.828 was added to a patient's chart, even when the patient had no symptoms, no exposure to COVID-19, and a negative COVID-19 antigen test result.  (FAC ¶ 72.)  Relator reviewed patient charts demonstrating that visits for patients with no symptoms, no exposure, and a negative COVID-19 test result, were coded and billed to Medicare and Medicaid as Level 3 E/M visits.  (FAC ¶ 105.) In addition, the FAC asserts that MedExpress submitted these claims to VA DMAS.  (FAC ¶ 106.) Accordingly, Relator has pled sufficient facts to state a claim under the VFATA.

## C. NJFCA (Counts Five & Six)

Relator alleges violations of the NJFCA and contends that MedExpress owns and operates "over 190 urgent care clinics in over a dozen states, including New Jersey." (FAC at ¶ 22.)  Relator

alleges that MedExpress' conduct constituted the presenting of false claims to the State of New Jersey and NJ DMAHS because "these false claims caused the State to pay out monies under the New Jersey Medicaid program that they would not have paid if they had known of the falsity of these claims." (FAC at ¶ 127.) Relator further alleges that MedExpress' conduct constituted the making of false claims/records to the State of New Jersey and NJ DMAHS because MedExpress submitted reimbursement claims for the treatment of Medicare and Medicaid beneficiaries using false documentation of patient visit records. (FAC at ¶¶ 106, 131.) MedExpress moves to dismiss Relator's claims under the NJFCA, *inter alia*, because Relator fails to plead its NJFCA claims with the particularity required by Rule 9(b). (D.E. 22 at 30–31.)

Relator's claims under the NJFCA are deficient, particularly in light of the heightened pleading standard for claims of fraud under Rule 9(b). While Relator cites to the specific NJFCA provisions that MedExpress allegedly violated, Relator does not plead with any specificity the who, what, where, and when of how MedExpress acted wrongfully in obtaining New Jersey State monies or benefits. The primary allegations in the FAC concerning the State of New Jersey are that MedExpress operates urgent care clinics in the State of New Jersey and treats patients in the state who are Medicare and Medicaid beneficiaries. (FAC at ¶¶ 21, 48, 106.) Without pleading facts specific to New Jersey, the FAC generally contends that MedExpress knowingly billed upcoded and unnecessary office visits to and received payments from Medicare and Medicaid. (*See generally* FAC.) The FAC alleges no specific facts demonstrating that MedExpress made false statements or misrepresentations, or concealed or failed to disclose information, in seeking to obtain an unauthorized payment or benefit under the NJ DMAHS. Moreover, Relator was employed at MedExpress' urgent care clinics in Virginia and sets forth allegations based upon her "firsthand" experience at the clinics in Virginia. (FAC at ¶ 20.) Relator cannot support an

allegation that MedExpress violated the laws of New Jersey based solely on events that she witnessed at urgent care clinics in Virginia. (*See generally* FAC.) The FAC lacks facts alleging with specificity that MedExpress made reimbursement claims for or otherwise caused the wrongful payments of New Jersey State monies or benefits. Accordingly, Relator's NJFCA claims in Counts Five and Six are dismissed.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, MedExpress' motion is **GRANTED IN PART** and **DENIED IN PART**. Counts One, Two, Three, and Four alleging violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* shall proceed, while Counts Five and Six alleging violations of the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.* are dismissed without prejudice. Any further amendments as to the dismissed counts shall be filed within thirty (30) days of the date of this Opinion. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:   Parties
         Leda D. Wettre, U.S.M.J.